IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LINCOLN NATIONAL LIFE INSURANCE CO., | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| TCF NATIONAL BANK, | ) | |
| Defendant. | ) | |
| ———————————————— | ) | 10 C 6142 |
| TCF NATIONAL BANK, | ) | |
| Counter/Third-Party Plaintiff, | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| LINCOLN NATIONAL LIFE INSURANCE CO., THE KLARCHEK FAMILY TRUST, and SUNSET VILLAGE LIMITED PARTNERSHIP, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Counter-Defendants and Third-Party Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This case arises out of a construction loan that Lincoln National Life Insurance Company made to Sunset Village Limited Partnership for construction at Sunset Village's mobile home community. The proceeds of the Loan were put on deposit with TCF National Bank, Sunset Village's banker. TCF administered the draws against the proceeds of the Loan that Sunset Village made as construction at the community progressed. The

proceeds of the Loan were secured by an Irrevocable Letter of Credit issued by TCF on behalf of Sunset Village and in favor of Lincoln National. The parties agreed to reduce, from time to time, the face amount of the Letter of Credit as the proceeds of the Loan were drawn down in order to reflect the balance of the proceeds of the Loan remaining on deposit at TCF. The face value of the Letter of Credit was reduced at least five times. This case revolves around the sixth and final attempt to reduce the Letter of Credit by Sunset Village before Lincoln National presented the Letter to TCF upon Sunset Village's default. The question in this case is whether the sixth reduction to the Letter of Credit was effectuated and what the remaining amount of the Letter of Credit was at the time it was presented to TCF by Lincoln National. TCF argues that Lincoln National is estopped from denying the sixth reduction in the Letter of Credit to $1,907,861.15 as a result of advances made to Sunset Village. Further, TCF argues that Lincoln National waived any right it may have had to mandate strict compliance with the terms of the agreement regulating the manner of reducing the Letter of Credit. The $1,907,861.15 sum represents the amount that TCF paid to Lincoln National when it presented the Letter of Credit to TCF for payment. This was the correct amount due on the Letter of Credit if the sixth reduction was made. Lincoln National, while not denying that the advances were made, argues that the sixth reduction to the Letter of Credit was invalid, and that the face amount of the Letter of Credit at the time it presented it to TCF was $3,189,693.69. If Lincoln National is correct

2

then $1,281,832.54 remains outstanding and due from TCF.

This case is now before the Court on Cross-Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Plaintiff, Lincoln National, brought suit in this Court against TCF, the Defendant, for the damages it incurred when TCF allegedly wrongfully dishonored the Letter of Credit. Upon being sued, TCF asserted affirmative defenses and counter-claims against Lincoln National, as well as against The Klarchek Family Trust and Sunset Village as Third-Party Defendants. Lincoln National previously moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). (Doc. 13). On March 7, 2011, this Court denied Lincoln National's motion on the grounds that the factual record was not adequately developed so as to entitle Lincoln National to judgment in its favor on the pleadings alone and enabled the parties to engage in discovery. (Doc. 31). Since that time, the parties have conducted extensive discovery and have established a fully developed record of facts. Both Lincoln National and TCF now move for summary judgment, asserting that each is entitled to judgment as a matter of law in their respective favors. For the reasons discussed below, TCF's Motion for Summary Judgment is denied and Lincoln National's Motion for Summary Judgment is granted.

## I.  The Material Undisputed Facts

The Lincoln National Life Insurance Company is a corporation organized under the

laws of the State of Indiana with its principal place of business in Greensboro, North

Carolina. (TCF 56.1 Resp. ¶ 1).[1]  TCF National Bank is a national banking association with

---

[1]The parties each submitted their Statements of Material Facts pursuant to Local Rule 56.1(a).  For the purposes of this opinion, TCF National Bank's Local Rule 56.1(b)(3)(B) Response to Lincoln National's Rule 56.1(a)(3) Statement of Material Facts is referred to as "TCF 56.1 Resp. ¶ _."  Lincoln National's Rule 56.1(b)(3)(B) Response to TCF's Rule 56.1(a)(3) Statement of Material Facts is referred to as "LN 56.1 Resp. ¶ _."  The parties also submitted Additional Statements of Material Facts in Opposition to Summary Judgment pursuant to Local Rule 56.1(b)(3)(C).  TCF's Response to Lincoln National's Statement of Additional Facts is referred to at "TCF Add'l 56.1 Resp. ¶ _."  Lincoln National's Response to TCF's Statement of Additional Facts is referred to as "LN Add'l 56.1 Resp. ¶ _."

In a highly unusual move, Lincoln National submitted a Reply to TCF's Local Rule 56.1(b)(3)(B) Response to Lincoln National's own 56.1(a)(3) Statement of Material Facts.  Such a reply is not envisioned by the Local Rules governing the procedure for submitting material facts in support of a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  *See generally Cichon v. Exelon Generation Co., L.L.C.*, 401 F.3d 803, 808-809 (7th Cir. 2005) (outlining the procedure for complying with Local Rule 56.1 and holding that it is within the district court's discretion to strike 56.1 statements as a penalty for failing to comply with the Local Rules) and *Ammons v. Aramark Unif. Servs., Inc.,* 368 F.3d 809, 817 (7th Cir. 2004) (same).  Local Rule 56.1 states that the moving party shall submit a statement of not more than 80 material facts as to which it contends there is no genuine issue and that therefore entitle the moving party to judgment as a matter of law.  *See* L.R. 56.1(a)(3); *accord Koszola v. Bd. of Educ. of City of Chicago,* 385 F.3d 1104, 1107-1108 (7th Cir. 2004).  Following the moving party's submission, the nonmoving party shall submit a concise response, either denying or admitting the material facts alleged in the moving party's statement.  *See* L.R. 56.1(b)(3); *accord Ammons,* 368 F.3d at 817.  In the case of any denials, the response must contain "specific references to the affidavits, parts of the record, and other supporting materials relied upon..." L.R. 56.1(b)(3)(B); *accord Ammons,* 368 F.3d at 817-818; *Brasic v. Heinemann's Bakeries, Inc.*, 121 F.3d 281, 286 (7th Cir. 1997) (stating that the nonmoving party's response must contain "appropriate specific references to the record.").  If the nonmoving party does not respond to or controvert the moving party's statement of material facts, those facts shall be deemed admitted by the Court.  *See* L.R. 56.1(b)(3)(C); *accord Ammons*, 368 F.3d at 817.  In addition to the admissions and denials submitted by the nonmoving party pursuant to Rule 56.1(b)(3)(B), the response by the nonmoving party may include up to 40 assertions of additional facts that the nonmoving party contends require the denial of summary judgment.  *See* L.R. 56.1(b)(3)(C); *accord Cichon,* 401 F.3d at 810.  The moving party then gets an opportunity to reply to the additional facts set forth by the nonmoving party pursuant to 56.1(b)(3)(C) in the same manner as that prescribed for the nonmoving party's response.  *See* L.R. 56.1(a); *accord Aukstuolis v. Harrah's Illinois Corp.*, No. 99 C 3593, 2002 WL 31006128, *2 (N.D. Ill. Sept. 5, 2002).  If the moving party does not reply to or controvert any of the additional facts alleged by the nonmoving

its principal office located in Wayzata, Minnesota. (*Id.* ¶ 2). Sunset Village Limited

Partnership is a limited partnership organized under the laws of the State of Illinois. (LN

56.1 Resp. ¶ 3). Sunset Village Limited Partnership is the sole owner of Sunset Village

Manufactured Home Community, located in Glenview, Illinois. (*Id.*).

On or around October 1, 2001, Lincoln National made a construction Loan to Sunset

Village for construction at its real property. (*Id.* ¶ 6). Lincoln National agreed to fund the

Loan, and the proceeds were deposited with TCF secured by a Letter of Credit. (LN 56.1

Resp. ¶ 10). [2] On or around April 20, 2006, Lincoln National, through its affiliate Delaware

---

party, those facts shall be deemed admitted by the Court. *See Ammons*, 368 F.3d at 817. This is the entire procedure by which the moving party submits its statement of material facts in support of summary judgment, the nonmoving party responds to the moving party's facts and asserts additional facts in opposition to summary judgment, and the moving party replies to the nonmoving party's statement of additional facts. When a case comes before the court on cross-motions for summary judgment the same practice is observed, with each party getting the opportunity to first submit its statements of material facts, followed by a response and additional facts, and then a reply. In no case does the moving party also get an opportunity to reply to the nonmoving party's 56.1(b)(3)(B) response to the moving party's own original 56.1(a)(3) statement of material facts. The moving party's reply is limited only to any additional facts alleged by the nonmoving party in its 56.1(b)(3)(C) statement. A local rule "of a federal district court is written by and for district judges to deal with special problems of their court," and therefore a district judge's interpretation of a local rule is entitled to considerable weight and great deference. *See Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir.1995). Furthermore, the Seventh Circuit has consistently held that district courts should mandate and enforce strict compliance with Local Rule 56.1. *See Ammons*, 368 F.3d at 817; *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002); *Bordelon v. Chicago Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir. 1994). The Court therefore strikes and disregards Lincoln National's Reply to TCF's Rule 56.1(b)(3)(B) Response to its 56.1(a)(3) Statement of Material Facts because such a reply is not authorized by the Local Rules and is improperly before the Court.

[2]Lincoln National attempts to deny this fact. However, its denial is unsubstantiated by any support in the record and is mere argument. TCF supports its statement of fact with the deposition testimony of David Veurink and Jay Klarchek. If the nonmoving party does not come

Investments, committed to increase its Loan to Sunset Village by $8,200,000.00. (TCF 56.1

Resp. ¶ 5).[3]  On or around June 20, 2006, Lincoln National funded to Sunset Village an

additional $8,200,000.00 as an increase to an existing $16,000,000.000 Credit Facility.  (*Id*. ¶

6).[4]  As part of the increased Loan, a First Amendment to Loan Agreement was executed

---

forward with evidence that would reasonably permit a finder of fact to find in favor of the
nonmoving party, then the moving party's statement of fact, if adequately supported, must be
accepted as true.  *See Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).
"Factual disputes are 'genuine' only if the evidence is such that a reasonable jury could return a
verdict for the nonmovant...Thus, [ ] the district court must decide whether the evidence presents
a sufficient disagreement to require submission to a jury or whether it is so one-sided that one
party must prevail" in its submission.  *See CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d
660, 676 (7th Cir. 2001) (quoting *Oest v. Ill. Dep't of Corrections*, 240 F.3d 605, 610 (7th Cir.
2001); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Summary judgment is the
"put up or shut up moment in a lawsuit, was a party must show what evidence it has that would
convince a trier of fact to accept its version of events."  *Schacht v. Wisconsin Dep't of Corr.*, 175
F.3d 497, 504 (7th Cir. 1999).  To adequately controvert a moving party's statement of fact, the
nonmoving party must submit "evidence [to] create more than some metaphysical doubt at to the
material facts;" "a mere scintilla of evidence in support of the nonmovant's position is
insufficient."  *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir.2001).  Here, Lincoln
National has submitted no support for its position, and therefore its argument is insufficient.

[3]TCF attempts to deny that this fact is supported by the evidence that Lincoln National
cites.  TCF's denial is unsubstantiated and is mere argument.  Lincoln National's assertion of fact
is substantiated by its Exhibit 78, a letter with a subject line stating "$8,200,000 Loan Increase."
An adequate denial of fact requires a citation to specific support in the record; a naked denial is
not sufficient to create a disputed issue of material fact.  *See Albiero*, 246 F.3d at 933.
Furthermore, the evidence that Lincoln National cites adequately supports the fact alleged and
TCF's submission is insufficient.  *See Clean Air Engineering, Inc.*, 267 F.3d at 676.

[4]TCF attempts to deny that this fact is supported by the evidence that Lincoln National
cites.  TCF's denial is unsubstantiated and is mere argument.  Lincoln National's assertion of fact
is supported by its Exhibit 6, the First Amendment to Loan Agreement, which states in relevant
part that the beneficiary "has requested a $8,200,000 increase to the existing $16,000,000 credit
facility."  An adequate denial of fact requires a citation to specific support in the record; a naked
denial is not sufficient to create a disputed issue of material fact.  *See Albiero*, 246 F.3d at 933.
Furthermore, the evidence that Lincoln National cites adequately supports the fact alleged and
TCF's submission is insufficient.  *See Clean Air Engineering, Inc.*, 267 F.3d at 676.

between Lincoln National and Sunset Village. (*Id.* ¶ 7). The First Amendment to Loan Agreement required, as part of the transaction, that Sunset Village deliver to Lincoln National a $7,075,000.00 Irrevocable Letter of Credit No. 06-015 issued by TCF to Lincoln National as additional security for the Loan. (*Id.*). Lincoln National is the beneficiary of the Letter of Credit. (*Id.* ¶ 20). The applicant under the Letter of Credit is Sunset Village. (*Id.* ¶ 22).

In the course of issuing the Letter of Credit, TCF approved a Credit Facility to Sunset Village. (*Id.* ¶ 9). TCF's Credit Facility required $7,100,000.00 in cash to be deposited as collateral with TCF at closing. (*Id.* ¶ 10). As additional security, TCF also took a second mortgage behind Lincoln National's mortgage on the subject real property interests. (*Id.*). The $7,100,000.00 cash deposit was to be funded out of the Lincoln National Loan to Sunset Village. (*Id.* ¶ 11). The TCF Credit Facility called for the case collateral received from the proceeds of the Lincoln National Loan to be placed in a deposit account at TCF. (*Id.* ¶ 12). Funds would then be advanced to Sunset Village from the deposit accounts at TCF as Sunset Village submitted construction draw requests. (*Id.*).

Paragraph 10(e) of the First Amendment to Loan Agreement provides (with party designations inserted) that:

> So long as no Default or Default Condition exists, and [Sunset Village] has delivered to [Lincoln National], with copies to [TCF], contractor's sworn statements, owner's sworn statements, copies of draw requests, lien waivers, project budget and amendments thereto and an affidavit of Richard

Klarcheck as required by [TCF], the Letter of Credit shall be reviewed by [Lincoln National] and appropriate reductions made every six (6) months after capital improvements are made to the property upon written notice of the amount of the reduction to [Sunset Village] and [TCF], such written notice of reduction shall not be later than thirty (30) days after [Sunset Village's] request for reduction.

(*Id.* ¶ 8). At the time TCF issued the Letter of Credit, it knew there was a risk of loss to it that would be equal to the deposit balance at any given point in time and the outstanding balance on the Letter of Credit at that same point in time. (*Id.* ¶ 14). TCF believed that its risk of loss was mitigated by a covenant limiting the potential variance between the deposit balance and the Letter of Credit balance to a maximum of $1,000,000.00, and by the second mortgage that TCF secured on the real property interests. (*Id.* ¶ 15).

The Letter of Credit was amended in writing on several occasions. (TCF 56.1 Resp. ¶ 24). A common procedure was used for each reduction in the Letter of Credit. (*Id.* ¶ 56). First, Capital First Realty, Inc., by letter addressed to NorthMarq Capital (Lincoln National's servicer of the Loan), requested a reduction in the Letter of Credit on behalf of Sunset Village, and submitted documentation to support the requested reduction. (*Id.* ¶ 56A). Personnel at NorthMarq then reviewed the request, and when it was in proper order, forwarded the reduction request in a letter to Lincoln National for its consideration. (*Id.* ¶ 56B). Lincoln National would then review the reduction request and the supporting documentation, and if it agreed that a reduction was in order, Lincoln National or its affiliate, Delaware Investments, would send a letter to TCF authorizing a reduction in the

Letter of Credit to a specific amount. (*Id.* ¶ 56C). Thereafter, TCF by letter directed to Lincoln National, as the beneficiary of the Letter of Credit, and to Sunset Village, as the applicant, stated that the Letter of Credit had been reduced to a specific amount. (*Id.* ¶ 56D). When the TCF reduction letter was issued, an authorized person at TCF would complete a TCF Commercial Lending Letter of Credit Input directing that the Letter of Credit be reduced to the new stated amount. (*Id.* ¶ 56E). Finally, personnel who actually made the input on the TCF records system completed an ACDS Maintenance Entry Form for Sunset Village indicating that the Letter of Credit had been reduced to the new stated amount. (*Id.* ¶ 56F). Each Letter of Credit reduction request submitted by Sunset Village to Lincoln National included contractor's sworn statements, owner's sworn statements, lien waivers, and construction draw wiring instructions to Sunset Village's TCF account. (LN Add'l 56.1 Resp. ¶ 1).

Pursuant to a written amendment issued by TCF, and in accordance with the specific procedure outlined above for reducing the Letter of Credit, on May 2, 2007, the Letter of Credit was reduced to $5,890,914.43. (TCF 56.1 Resp. ¶ 25). On May 8, 2008, pursuant to a written amendment issued by TCF, and again in accordance with the procedure for reducing the Letter, the Letter of Credit was further reduced to $5,464,537,01. (*Id.* ¶ 26). On January 16, 2009, the Letter was again reduced to $4,873,458.49 pursuant to a written amendment by TCF and in accordance with the formal procedure for reducing the Letter.

(*Id.* ¶ 27).  On June 24, 2009, less than six months after its prior request for a reduction in the Letter of Credit, Sunset Village requested another reduction.  (LN 56.1 Resp. ¶ 30).  Pursuant to a written amendment issued by TCF on August 13, 2009, and in accordance with the procedure for reducing the Letter, the Letter was reduced to $4,187,357.30.  (TCF 56.1 Resp. ¶ 28).  The agent responsible for approving the request testified that the timing of the fourth reduction request did not concern her.  (LN 56.1 Resp. ¶ 35).  Less than six months later, on November 16, 2009, Sunset Village again requested a reduction in the Letter of Credit.  (*Id.* ¶ 39).  On January 18, 2010, the Letter of Credit was accordingly reduced pursuant to a written amendment issued by TCF and in accordance with the procedure for reducing the letter to $3,189,693.69.  (TCF 56.1 Resp. ¶ 29).  Lincoln National never raised any objection to Sunset Village's fifth request for a reduction in the Letter of Credit, despite the fact that it occurred less than six months after the fourth reduction request was approved on August 12, 2009.  (LN Add'l 56.1 Resp. ¶ 3).  Each of these amendments were further acknowledged by TCF in a receipt it delivered to Lincoln National on August 30, 2010.  (TCF 56.1 Resp. ¶ 30).

TCF made three draws for improvements to the Sunset Village property that took place between January 26, 2010 and March 8, 2010, totaling $937,333.09.  (LN 56.1 Resp. ¶ 47).  By a letter to NorthMarq Capital dated March 8, 2010, Sunset Village requested a sixth reduction in the Letter of Credit from $3,189,693.69 to $2,252,360.60 to reflect these

construction disbursements. (TCF 56.1 Resp. ¶ 31). By e-mail dated April 6, 2010, Elizabeth Goff-Plourd, on behalf of Lincoln National, denied Sunset Village's sixth request for a reduction in the Letter of Credit. (*Id.* ¶ 32). Goff-Plourd's stated reason for denying the reduction was the fact that, under Lincoln National's interpretation of Paragraph 10(e) of the First Amendment to Loan Agreement, Sunset Village was only entitled to obtain a reduction in the Letter of Credit once every six months, and Sunset Village was last approved for a reduction on January 18, 2010, less than six months prior to the March 2010 request. (*Id.*). In the same e-mail, Goff-Plourd indicated that she had reviewed all the documentation submitted in connection with the request for a reduction in the Letter of Credit and that Lincoln National agreed with Sunset Village's figures, but that the timing requirement only entitled Sunset Village to a reduction once every six months. (LN 56.1 Resp. ¶ 50). No subsequent request for a reduction in the Letter of Credit was made by Sunset Village. (TCF 56.1 Resp. ¶ 33).

In April 2010, Sunset Village made a draw request against the Loan proceeds on deposit with TCF. (LN 56.1 Resp. ¶ 52). David Veurink, an Executive Vice President and Manager of the Commercial Banking Division at TCF, was responsible for overseeing the Letter of Credit and Sunset Village's Loan. (*Id.* ¶ 53). Veurink refused to approve Sunset Village's April 2010 draw because Lincoln National had not acknowledged that the Letter of Credit had been reduced in accordance with the sixth reduction request of March 2010.

(*Id*. ¶ 54). Veurink refused to approve the draw because TCF was approaching the $1,000,000.00 difference limit between what was on deposit with TCF and the then-existing amount of the Letter of Credit. (*Id*. ¶ 55). On April 15, 2010, a representative from NorthMarq corresponded with Vuerink regarding Lincoln National's statement that it could not reduce the Letter of Credit due to the sixth month timing requirement of Paragraph 10(e) of the First Amendment to Loan Agreement. (*Id*. ¶ 56). In this correspondence, the NorthMarq representative told Vuerink that the Loan between Lincoln National and Sunset Village was current and that Sunset Village was in good standing with Lincoln National, and that "Lincoln [was] simply conforming to the loan documents here and there [were] no other issues for them." (*Id*.). On April 28, 2010, a draw was advanced by TCF for construction on the Sunset Village property in the amount of $348,754.82. (*Id*. ¶ 57).

On or around June 5, 2010, an installment payment on the Loan was due from Sunset Village to Lincoln National. (TCF 56.1 Resp. ¶ 35). On June 7, 2010, Lincoln National instituted an Automatic Clearing House debit in the amount of the payment due. (*Id*. ¶ 35). The debit was returned unpaid on June 9, 2010. (*Id*.). On June 22, 2010, Lincoln National sent Sunset Village a default notice. (*Id*. ¶ 36). The June Default Notice demanded that Sunset Village make a payment in the amount of $202,623.04 on or before June 29, 2010. (*Id*.) On June 29, 2010, Lincoln National received from Sunset Village a check in the

12

amount of $202,623.04. (*Id*. ¶ 37). Without waiving any rights or remedies arising out of such late payment, Lincoln National applied it to the outstanding balance of the Loan. (*Id*.).

On July 5, 2010, another installment payment in the amount of $192,974.32 was due by Sunset Village to Lincoln National. (*Id*. ¶ 38). Because July 5, 2010 was a bank holiday, Lincoln National instituted an Automatic Clearing House debit on July 6, 2010. (*Id*. ¶ 39) The debit was returned unpaid on July 8, 2010. (*Id*.). On July 15, 2010, Lincoln National sent Sunset Village a July Default Notice, demanding payment on or before July 22, 2010, in the amount of $202,623.04. (*Id*. ¶ 40). Sunset Village failed to make the payment demand by the July deadline. (*Id*. ¶ 41).

Due to Sunset Village's default, Lincoln Nation accelerated the Loan. (*Id*. ¶ 42). On July 29, 2010, Lincoln National sent Sunset Village an Acceleration Notice via Federal Express overnight delivery and by PDF format e-mail. (*Id*.). Sunset Village tried to negotiate a reinstatement of the Loan, but eventually failed to execute and return the Conditional Reinstatement Letter to Lincoln National by the deadline of August 25, 2010. (*Id*. ¶¶ 43; 44). By letter to Sunset Village dated August 27, 2010, Lincoln National summarized all of these events and provided Sunset Village with additional information, including the fact that the face amount of the Letter of Credit was $3,189,693.69. (*Id*. ¶ 45). On August 30, 2010, an agent for Lincoln National presented to TCF the original Irrevocable Standby Letter of Credit, along with an original sight draft dated August 30,

13

2010, and written wiring instructions. (*Id.* ¶ 46).

Prior to August 30, 2010, when the Letter of Credit was presented to TCF for payment, the last written documents of their kind from TCF relating to reductions in the Letter of Credit was TCF's letter dated January 18, 2010, stating that the Letter of Credit was reduced to $3,189,693.69. (*Id.* ¶ 47). According to Lincoln National's records, TCF never advised Lincoln National, in writing or orally, that it contended that the Letter of Credit had been reduced to an amount below $3,189,693.69 until after the Letter of Credit was presented by Lincoln National to TCF for payment on August 30, 2010. (*Id.* ¶ 48). On August 31, 2010, TCF wire transferred $1,907,861.15 to Lincoln National. (*Id.* ¶ 49).

Lincoln National contends that there remains a balance of $1,281,832.54 owing to it from TCF under the Letter of Credit. (*Id.* ¶ 57). TCF takes the position that the Letter of Credit was reduced by $937,333.09, the amount of the rejected sixth reduction by Lincoln National. (LN 56.1 Resp. ¶ 68). TCF argues that the difference between the $3,189,693.69 sight draft and the amount TCF wired to Lincoln National constitutes the amount of the sixth reduction plus the $348,754.82 advance of April 28, 2010. (*Id.*).

## II. The Standard of Review

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a);

14

*see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine issue of material fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); *Omnicare Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704 (7th Cir. 2011); *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). When a case comes before the Court on cross-motions for summary judgment, the Court must look to the burden of proof that each party would bear on an issue at trial and then require that party to go beyond the pleadings and establish through competent evidence a genuine issue of material fact. *See Santella v. Metropolitan Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997) (citing *Celotex*, 477 U.S. at 324). However, on summary judgment the Court will limits its analysis of the facts to the evidence that is supported by the parties' Local Rule 56.1 statements properly before the Court. *See F.T.C. v. Bay Area Business Council, Inc.*, 423 F.3d 627, 634 (7th Cir. 2005); *Bordelon v. Chicago Sch. Reform Bd. of Tr.*, 233 F.3d 524, 529 (7th Cir. 2000). When a proposed statement of fact is supported by the record and not adequately controverted by the opposing party, the Court will accept that statement as true. *See Alberio*, 246 F.3d at 933. To adequately dispute a statement of fact, the opposing party must cite to specific support in the record; an unsubstantiated denial or a denial that is mere argument or conjecture is not sufficient to create a genuinely disputed issue of material fact. *See Id*. Factual disputes "are genuine only if the evidence

is such that a reasonable jury could return a verdict for the nonmovant." *CAE, Inc. v. Clean Air Engineering, Inc.*, 267 F.3d 660, 676 (7th Cir. 2001) (quoting *Anderson*, 477 U.S. at 248) (internal quotations and citations omitted). The existence of a materially disputed issue of fact will be sufficient to avoid summary judgment only if the disputed fact is determinative of the outcome under the applicable law. *See Montgomery v. American Airlines, Inc.*, 626 F.3d 382, 389 (7th Cir. 2010); *Tyler v. Runyon*, 70 F.3d 450, 464 (7th Cir. 1995). Disputes arising out of letter of credit transactions are particularly well suited to resolution by way of summary judgment because such disputes essentially involve only contract interpretation and thus liability under a letter of credit often presents solely legal questions. *See Zemco Mfg., Inc. v. Navistar Intern. Transp. Corp.*, 270 F.3d 1117, 1123 (7th Cir. 2001); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1388 (7th Cir. 1993). The Court may resolve a dispute on summary judgment where the parties do not dispute the facts that actually occurred, but merely dispute the legal significance of those facts. That the parties differ on the legal ramifications to be drawn from the undisputed facts in the record is not a bar to summary judgment.

## III. Discussion

Under Illinois law, a "letter of credit" is "a definite undertaking that satisfies the requirements of Section 5-104 [of the Uniform Commercial Code] by an issuer to a beneficiary at the request or for the account of the applicant or, in the case of a financial

16

institution, to itself or for its own account, to honor a documentary presentation by payment or delivery of an item of value." 810 ILCS 5/5-102. A transaction for a letter of credit involves three discrete contracts. *See Village of Long Grove v. Austin Bank of Chicago*, 644 N.E.2d 456, 458 (Ill. App. Ct. 1994) (citing *Jupiter Orrington Corp. v. Zweifel*, 469 N.E.2d 590, 592 (Ill. App. Ct. 1984) (citing *Baker v. National Boulevard Bank of Chicago*, 399 F. Supp. 1021, 1024 (N.D .Ill. 1975)). The first is the contract between the beneficiary (Lincoln National) and the applicant (Sunset Village). *See Jupiter Orrington Corp.*, 469 N.E.2d at 592. In this case, the contract is the Loan and the accompanying Loan Agreement between Lincoln National and Sunset Village. The second contract is the letter of credit, which is procured by the applicant (Sunset Village), frequently from a bank (TCF), in exchange for valid consideration or collateral. *See Id.* (citing *First Arlington Nat. Bank v. Stathis*, 413 N.E.2d 1288, 1293 (Ill. App. Ct. 1980)). In the instant case, Sunset Village procured the Letter of Credit from TCF in exchange for a note and a second mortgage on the subject property interests. Last, there is the letter of credit contract, in which the bank (TCF) agrees to pay the beneficiary (Lincoln National) the value of the letter if the applicant (Sunset Village) satisfies the conditions in the letter. *See Jupiter Orrington Corp.*, 469 N.E.2d at 592. Here, the Letter of Credit issued by TCF is a standby letter of credit, which is a letter of credit under which the issuer agrees to pay the beneficiary upon the presentation of certain documents that show that the applicant is in default on an outstanding obligation. *See First*

*Arlington Nat. Bank*, 413 N.E.2d at1293. For the Letter of Credit at issue here, the documentation required to draw on the Letter of Credit is both a sight draft, which is a bill that is payable on demand or upon presentation, and the original Letter of Credit.

The threshold question in this case is whether TCF can properly look beyond the documents that Lincoln National was required to submit to draw on the Letter of Credit and instead rely upon the agreement between Lincoln National and Sunset Village in determining whether to honor the Letter of Credit and in what amount. *See First Arlington Nat. Bank*, 413 N.E.2d at 1293 (the threshold question in a letter of credit case is whether the issuer can properly look beyond the documents required to be submitted to draw on the letter of credit and instead to the agreement between the applicant and the beneficiary). A letter of credit is secured by a lender for the primary purpose of assuring "swift and reliable payment in commercial transactions." *Eakin v. Cont'l Ill. Nat'l Bank & Trust Co.*, 875 F.2d 114, 115 (7th Cir. 1989). To achieve these ends, letters of credit are normally governed by the independence principle. *See Matter of P.A. Bergner & Co.*, 140 F.3d 1111, 1118 (7th Cir. 1998). The independence principle holds that the third agreement in a letter of credit transaction–the bank's agreement to pay the beneficiary the amount of the letter of credit if the applicant satisfies the conditions of the letter–is entirely independent of the other two agreements. *See, e.g., Integrated Measurements Systems, Inc. v. International Commercial Bank of China*, 757 F. Supp. 938, 942 (N.D. Ill. 1991). That is, the agreement between the issuer

18

and the beneficiary does not depend on, and may not be varied by, the other two agreements in a letter of credit transaction.

The independence principle "prohibits the issuer of a letter of credit from looking at any material or facts other than those appearing in the draw documents themselves." *Occidental Fire & Casualty Co. of North Carolina v. Continental Bank N.A.*, 918 F.2d 1312, 1315 (7th Cir. 1990). An issuing bank deals in documents and not in contract performance, and therefore the issuer is generally under a duty to carefully examine the draw documents submitted by the beneficiary to ascertain whether, on their face, they comply with the terms contained in the letter of credit. *See Pastor v. National Republic Bank of Chicago*, 390 N.E.2d 894, 897 (Ill. 1979); *First Arlington Nat. Bank*, 413 N.E.2d at 1293 (citing *Werner v. A. L. Grootemaat & Sons, Inc.*, 259 N.W.2d 310 (Wisc. 1977)). If the documents presented to the issuer by the beneficiary conform to the requirements contained in the letter of credit, the issuer may not go behind the documents before honoring the beneficiary's demand for payment and the issuer has a duty to pay the beneficiary irrespective of the rights and obligations of the parties contained in the underlying contract between the applicant and the beneficiary. *See First Arlington Nat. Bank*, 413 N.E.2d at 1293 (citing *New York Life Insurance Co. v. Hartford National Bank & Trust Co.*, 501, 378 A.2d 562, 567 (Conn. 1977); *Intraworld Industries v. Girard Trust Bank*, 336 A.2d 316 (Penn. 1975); *Republic National Bank of Dallas v. Northwest National Bank of Fort Worth*, 578 S.W.2d 109, 114 (Tx. 1978); *Pastor*, 390

N.E. 2d 894). The duty of the issuer to pay the beneficiary is therefore entirely independent of the underlying agreement between the beneficiary and the applicant. This independence principle requires the issuer of the letter of credit to pay the beneficiary upon a proper demand even if the beneficiary breached the underlying agreement, so long as the breach was not fraudulent. *See Teleport Communications Group, Inc. v. Barclay Financial Group, Ltd.,* 176 F.3d 412, 414 (7th Cir. 1999) ("The purpose of a letter of credit is to provide a means of assuring payment cheaply by eliminating the need for the issuer to police the underlying contract.") (internal quotations and citations omitted); *First Arlington Nat. Bank*, 413 N.E.2d at 1293-1294 (citing *Chase Manhattan Bank v. Equibank*, 394 F. Supp. 352 (W.D. Pa. 1975), *vacated on other grounds*, 550 F.2d 882 (3rd Cir. 1977); *Fidelity Bank v. Lutheran Mutual Life Insurance Co.*, 465 F.2d 211 (10th Cir. 1972); *Prudential Insurance Co. of America v. Marquette National Bank of Minneapolis,* 419 F. Supp. 734 (D. Minn. 1976); *Brummer v. Bankers Trust of South Carolina*, 231 S.E.2d 298 (S.C. 1977); *Dovenmuehle, Inc. v. East Bank of Colorado Springs, N. A.*, 563 P.2d 24 (Co. App. Ct. 1977)) ("[T]he obligation of the issuer to pay the beneficiary is completely independent of the underlying agreement. . . and the issuer's obligation to honor the credit therefore remains intact, even if the underlying agreement has been modified or non-fraudulently breached.") (internal citations omitted). Therefore, the obligation of the issuer to pay the beneficiary of the letter of credit is independent of the underlying agreement between the beneficiary and the applicant, and the issuer's

obligation to honor the letter of credit remains unchanged, even if the underlying agreement between the beneficiary and the applicant is modified or non-fraudulently breached. *See, e.g., Louis Berger Group, Inc. v. JPMorgan Chase Bank, N.A.*, No. 11 C 430, 2011 WL 2837462, *2 (N.D. Ill. July 18, 2011) (letters of credit are completely independent of the underlying contract on which they are based and fraud in the transaction is the only exception allowing the customer to intervene in the letter of credit contract between the issuer and the beneficiary); *BM Electronics Corporations v. LaSalle Bank, N.A.*, No. 04 C 5375, 2006 WL 760196, *2 (N.D. Ill. March 22, 2006) (citing *Integrated Measurement Systems, Inc.*, 757 F. Supp. at 942) (same); *Banco Del Estado v. Navistar Intern. Transp. Corp.*, 954 F. Supp. 1275, 1282 (N.D. Ill. 1997) (citing *Pioneer Bank & Trust Co. v. Seiko Sporting Goods, U.S.A. Co.*, 540 N.E.2d 808, 811 (Ill. App. Ct. 1989)) (the letter of credit is independent of the underlying contract and the obligations under the letter have no relationship to the compliance of the buyer or seller with the underlying contract, and when the documents presented comply with the terms of the letter the issuer is required to pay unless there is fraud in the transaction); *see also Solar v. Weinberg*, 653 N.E.2d 1365, 1369 (Ill. App. Ct. 1995) (quoting *Pastor*, 390 N.E.2d at 899) (a letter of credit is an undertaking independent of any underlying contract between the issuer and the beneficiary and as such the terms and conditions of the letter govern the issuer's absolute duty to pay); *Village of Long Grove*, 644 N.E.2d at 458 ("The general rule, known as the independence principle, posits that if the

documents presented conform to the requirements stated in the letter of credit, the bank may not look to the underlying contract between the customer and the beneficiary in determining whether to honor the demand."); *Pioneer Bank & Trust Co.*, 540 N.E.2d at 811 (the letter of credit is independent of the underlying agreement between the issuer and the beneficiary, and when the specified documents presented comply with the specifications in the letter of credit, the issuer is obligated to pay); *First Arlington Nat. Bank*, 413 N.E.2d at 1293-1294 (the issuer of a letter of credit is not permitted to assert any defenses which the beneficiary may have to the underlying contract when presented with a proper demand for payment).

The independence principle is codified in Illinois' adoption of the Uniform Commercial Code. Section 5-103 of the Code states:

> Rights and obligations of an issuer to a beneficiary or a nominated person under a letter of credit are independent of the existence, performance, or nonperformance of a contract or arrangement out of which the letter of credit arises or which underlies it, including contracts or arrangements between the issuer and the applicant and between the applicant and the beneficiary.

810 ILCS 5/5-103(d). The independence principle protects the commercial viability of letters of credit. *See Transparent Prods. Co v. Paysaver Credit Union*, 864 F.2d 60, 63 (7th Cir. 1988) ("Letters of credit give assurance of payment; to promote the reliability of the device, courts do not look beneath the surface of the documents to discover side agreements, discover the intent of the parties, and the like."); *Instituto Nacional De Comercializacion Agricola (Indeca)*

*v. Cont'l Ill. Nat'l Bank & Trust Co.*, 858 F.2d 1264, 1269 (7th Cir. 1988) ("All letters of credit are bottomed on the principle that the parties are *not* required to look beyond the face of the documents presented") (emphasis in original) (internal quotations and citations omitted).

The Illinois courts have likewise held that the independence principle is a means of effectuating the usefulness of letters of credit in commercial transactions. *See Village of Long Grove*, 644 N.E.2d at 459-460 ("Th[e] rule was developed to protect the commercial viability of letters of credit. . .To follow [the argument that equitable considerations should excuse the issuer from honoring the letter] would effectively emasculate the purpose and value of letters of credit in commercial transactions."); *Pioneer Bank and Trust Co.*, 540 N.E.2d at 889 (the letter of credit is independent of the underlying contract, and when the documents presented comply with the conditions specified in the letter of credit, the issuer is authorized and obligated to pay); *Stringer Const. Co., Inc. v. American Ins. Co.*, 430 N.E.2d 1, 4 (Ill. App. Ct. 1981) (under the UCC "the issuer of the letter of credit has no right to refuse to honor a complying draft or demand" and the independent principle prohibits the issuer to go behind the documents; "[i]f this were otherwise, the unique commercial usefulness of the letter of credit as a vehicle of rapid and guaranteed payment in commercial transactions would be destroyed.") (internal quotations and citations omitted).

As stated above, the only exception to the independence principle is for

23

fraud–whereby an issuer may look to the underlying contract between the beneficiary and the applicant if a breach of that contract was occasioned by fraud. *See Stringer Const. Co.*, 430 N.E.2d at 5. Illinois courts have construed the fraud exception very narrowly. *See Id.* (under the UCC a court may look at the underlying contract only if there is fraud, forgery, or other defect in the documents, and the UCC is narrowly interpreted such that the fraud must vitiate the entire transaction: fraud in the factum or in forming the underling agreement is required.); *First Arlington Nat. Bank*, 413 N.E.2d at 1295 (the fraud exception is narrowly tailored to instances of fraud in which the wrongdoing of the beneficiary vitiates the entire transaction such that the independence principle would no longer be served; the fraud must be fraud in the factum, and not fraudulently calling the letter of credit). Actual fraud is the only affirmative defense that can obviate the requirement implied by the independence principle that the issuer must pay the beneficiary on the letter of credit without recourse to other agreements or courses of conduct. *See Village of Long Grove*, 644 N.E.2d at 460 (noting fraud as "the one recognized exception to the [issuer's] otherwise absolute duty to pay," and holding that an alleged impossibility of performance on the part of the beneficiary, or an alleged inequity, does not provide a reason for the issuer to reject the beneficiary's claim for payment) (citing *Newcastle Properties, Inc. v. Shalowitz*, 582 N.E.2d 1165 (Ill. App. Ct. 1991); *Pioneer Bank & Trust Co.*, 540 N.E.2d 808; *Mount Prospect State Bank v. Marine Midland Bank*, 459 N.E.2d 979 (Ill. App. Ct. 1983); *First*

24

*Arlington Nat. Bank*, 450 N.E.2d at 833; *Professional Modular Surface, Inc. v. Uniroyal, Inc.*, 440 N.E.2d 177 (Ill. App. Ct. 1982); *Stringer*, 430 N.E.2d at 1). All other affirmative defenses fail as a matter of law. *See Village of Long Grove*, 644 N.E.2d at 460. Therefore, in letter of credit transactions and disputes arising therefrom courts do not look to the underlying contract between the applicant and the beneficiary except to ascertain whether fraud exists that would otherwise excuse the issuer's failure to pay on the letter of credit.

TCF has not made any allegations of fraud with respect to any alleged breach of the Loan Agreement between Lincoln National and Sunset Village. The application of the independence principle to the instant case thus eliminates TCF's arguments and defenses. Application of the independence principle relieves the Court of the need to consider whether Lincoln National acted properly in rejecting Sunset Village's sixth reduction request; whether Lincoln National's interpretation of Paragraph 10(e) of the First Amendment to Loan Agreement was correct; whether Lincoln National had knowledge of the fact that TCF was funding Sunset Village's construction draws; whether Lincoln National waived its right to strict compliance with the six month timing requirement for Letter of Credit reductions under Paragraph 10(e) of the First Amendment to Loan Agreement; and whether Lincoln National is estopped from denying that a sixth reduction in the Letter of Credit occurred. *See Village of Long Grove*, 644 N.E.2d at 459 (rejecting impossibility of performance and equitable principles as grounds for failing to honor a

letter of credit and instead holding that the independence principle requires the issuer to pay the beneficiary irrespective of the alleged impossibility of the applicant to perform its underlying obligations and the possible inequity of requiring performance); *Jupiter Orrington Corp.*, 469 N.E.2d at 591 (rejecting waiver and estoppel as defenses to the requirement that the issuer must pay the beneficiary subject to the independence principle); *see, e.g., Integrated Measurement Systems, Inc.*, 757 F. Supp at 945 (rejecting the argument that a condition of the underlying contract, and one party's interpretation of that contract, allowed the issuer to dishonor the letter of credit and instead holding that the independence principle put such arguments out of reach). Section 5-103 of Illinois' adoption of the Uniform Commercial Code makes TCF's obligations, as the issuer of the Letter of Credit, to Lincoln National, as the beneficiary, independent of the outcome of these issues. TCF's obligations to Lincoln National are those expressed in the Letter of Credit itself, and those obligations do not change with any of these other extraneous matters. TCF was required, by the express terms of the Letter of Credit, to pay the stated amount upon Lincoln National's presentation of a sight draft and the original Letter of Credit. Lincoln National presented TCF with the required documentation on August 30, 2010. TCF was therefore required to pay the face amount of the Letter of Credit.

TCF's theory is that Lincoln National's decision not to reduce the Letter of Credit a sixth time depends upon an interpretation of a provision of the First Amendment to Loan

26

Agreement that Lincoln National waived. TCF claims that Lincoln National is equitably estopped from denying the sixth reduction because it amended the underlying agreement by implication and acted in accordance with procedures adopted by the parties to amend and reduce the Letter in previous reductions. Alternatively, TCF argues that in refusing the sixth reduction Lincoln National was in breach of the Loan Agreement between it and Sunset Village. But the independence principle places these arguments out of bounds. TCF cannot rely on breach, waiver, or estoppel arguments with respect to the agreement between Lincoln National and Sunset Village as a basis for failing to honor the Letter of Credit in full. *See Village of Long Grove*, 644 N.E.2d at 459 (breach of contract on grounds of impossibility of performance and equitable arguments that the issuer should be excused from performance are not adequate grounds to support a finding of fraud within the fraud exception to the independence principle, and must be rejected as arguments for failing to honor a letter of credit); *Jupiter Orrington Corp.*, 469 N.E.2d at 591 (finding waiver and estoppel to be an impermissible basis on which to enjoin performance of a letter of credit on the basis of the independence principle, and holding that "the independence principle [ ] requires the issuer of the credit to pay the beneficiary even where the beneficiary nonfraudulently breached the underlying contract."); *see, e.g., Integrated Measurement Systems, Inc.*, 757 F. Supp at 945 ("Thus it is that any modification or non-fraudulent breach of the underlying contract does not affect the rights and duties under the [Letter of Credit].

Accordingly this Court must not, and it will not, entertain any arguments" that the issuer should be excused from performance based on breach or estoppel arguments) (internal citations omitted). TCF's arguments require the Court to look beyond the Letter of Credit agreement and instead to the contract between Lincoln National and Sunset Village or to the parties' course of conduct, and this is what the independence principle explicitly forbids. The Letter of Credit that TCF issued to Lincoln National did not tie the reductions in the Letter to TCF's funding of construction draws to Sunset Village. Thus, under Illinois law the only question is whether Lincoln National consented to the sixth reduction in the Letter of Credit, which would have reduced the face amount of the Letter below the amount of the Letter on January 18, 2010, which at that time was $3,189, 693.69.

TCF argues that based on a course of dealing between TCF, Lincoln National, and Sunset Village, "once Lincoln National received the required documentation and approved the same, additional express consent was merely ministerial, rather than substantive, to amend the Letter of Credit." The record establishes that for an amendment in the Letter of Credit to occur a formal exchange of documents was required. First, a written request on behalf of Sunset Village had to be tendered to NorthMarq, Lincoln National's servicer of the Loan. Then Lincoln National, only upon its own independent approval of the reduction, would send a letter to TCF authorizing it to reduce the Letter by a stated amount. TCF would then issue a letter to Sunset Village and Lincoln National stating that

the Letter had been reduced to the new amount. After the TCF reduction letter was issued, an authorized person at TCF would complete a TCF Commercial Lending Letter of Credit Input directing that the Letter of Credit be reduced to the new stated amount. Finally, personnel who actually made the input on the TCF records system completed an ACDS Maintenance Entry Form for Sunset Village indicating that the Letter of Credit had been reduced to the new stated amount. Only after these required documents were delivered and actions taken did the reductions in the Letter of Credit actually occur. The record indicates that this procedure was not followed for the sixth amendment and that there is no support for TCF's contention that the Letter of Credit was amended after January 18, 2010 to an amount below $3,189,693.69.

TCF argues that Lincoln National consented by implication to the sixth reduction request by previously allowing reductions at less than six month intervals and by acknowledging that Sunset Village would have been applicable for a reduction pursuant to its March 2010 request but for the timing requirement of Paragraph 10(e) of the First Amendment to Loan Agreement. Section 5-104 of Illinois's adoption of the Uniform Commercial Code, which concerns amendments to letters of credit, states that a letter of credit and any "amendment. . .be issued in any form that is a record and is authenticated. . .by a signature. . ." 810 ILCS 5/5-104. "Record," within the meaning of this provision "means information that is inscribed on a tangible medium, or that is stored in an electronic

or other medium and is retrievable in perceivable form." 810 ILCS 5/5-102(14). Thus, in order to amend a letter of credit there must be a record with a signature setting forth the reduced stated amount of the letter of credit. *See* 810 ILCS 5/5-104. In addition to the requirement that there be a record memorializing any amendment to a letter of credit, the beneficiary must consent to the reduction. *See* 810 ILCS 5/5-106(b). In this case there is no signed record that would constitute an amendment reducing the Letter of Credit below the January 18, 2010 amount of $3,189,693.69. TCF argues that a signed record is not required because a party can consent to an amendment reducing a letter of credit by implication.

The official commentary to Section 5-106 of the Code, which pertains to consent to amendments to letters of credit, states that "a person can consent to an amendment by implication." 810 ILCS 5/5-106, Cmmt. 2. This does not mean that the commentary envisions a scenario in which a letter of credit can be *amended* by implication through the conduct of the parties. Such an argument conflates two discrete issues, which are themselves located in two different provisions of Illinois' adoption of the Uniform Commercial Code. The first concerns amendments to letters of credit, which are governed by Section 5-104 of the Code. That Section states that "[a] letter of credit, confirmation, advice, transfer, amendment, or cancellation may be issued in any form that is a record and is authenticated (i) by a signature or (ii) in accordance with the agreement of the parties or the standard practice referred to in Section 5-108(e)." 810 ILCS 5/5-104. The second

concerns *consent* to amendments to letters of credit, which is governed by Section 5-106 of the Code. That Section provides, in relevant part, that "[a]fter a letter of credit is issued, rights and obligations of a beneficiary, applicant, confirmer, and issuer are not affected by an amendment or cancellation to which that person has not consented except to the extent the letter of credit provides that it is revocable or that the issuer may amend or cancel the letter of credit without that consent." 810 ILCS 5/5-106(b).

TCF incorrectly conflates consent to an amendment (Section 5-106), which may be made through implication, with the requirement that an amendment itself be made through a record (Section 5-104). There is no known support in the law for the proposition than an amendment to a letter of credit can be made by implication, as opposed to consent to an amendment, which can be made through implication. *See* 810 ILCS 5/5-106, Cmmt. 2. TCF does not supply any statute, commentary, decisional law, or treatise to support its argument that an amendment to a letter of credit can be made by implication.

Under the Uniform Commercial Code, an amendment to a letter of credit (which is to say, a signed record) can be issued by one of the parties to the letter, for example the issuer; but it would not be binding on the beneficiary unless there is evidence of the beneficiary's consent to be bound by the amendment. The usual means of obtaining consent to an amendment is through signed records executed by each of the parties reducing the letter of credit to a stated amount. According to Comment 2 to Section 5-106

of the Code, however, consent to an amendment can be made through implication. *See* 810

ILCS 5/5-106, Cmmt. 2. The scenario that Comment 2 envisions is one where a party to a

letter of credit proffers an amendment in the form of a signed record (in compliance with

Section 5-104) and the other party, aware of the written amendment, acts in a manner

consistent with that amendment. In such a case, the latter party can be said to have

consented to the written amendment by implication, even though it never evidenced its

intent to consent to the amendment by a record of its own making.

TCF has not offered any caselaw in which a court has held that a party to a letter of

credit impliedly consented to an amendment. While such implied consent to an

amendment is conceivably possible based on the commentary to the Code, TCF has not

supplied a single case to demonstrate such implied consent, nor do the facts of this case

suggest that Lincoln National impliedly consented to an amendment to the Letter of Credit.

There is no signed record by Lincoln National reducing the Letter below the amount of

$3,189,693.69. Lincoln National likewise took no action that could conceivably be described

as consenting to the (non-existent) amendment to the Letter of Credit. On the contrary,

Lincoln National took action denying the requested sixth reduction, which constitutes the

opposite of consent to such a (non-existent) amendment. To fall within the principle of

Comment 2, TCF would have had to have issued an amendment to the Letter of Credit

reducing it to the sum of $1,907,861.15, and then Lincoln National would have had to have

taken some affirmative act consistent with that amendment. *See, e.g., Stringer Const. Co. v. La Grange State Bank*, 499 N.E.2d 948, 951 (Ill. App. Ct. 1984) (holding that a bank's failure to obtain the consent of a customer prior to granting a contractor's request for extension of a letter of credit was unnecessary where the customer had "otherwise agreed" to remain bound regardless of extensions of time to the letter of credit). The record shows that such events never occurred.

TCF argues that Goff-Plourd's e-mail denying the requested reduction on behalf of Lincoln National in fact constitutes the necessary record amending the letter of credit. It is unclear how Goff-Plourd's e-mail explicitly *denying* the requested reduction can simultaneously be construed as the necessary record *approving* the requested reduction. Such an argument seems illogical on its face. In any event, the formalities for reducing the Letter of Credit, which TCF acknowledges were a standard procedure by which the parties amended the Letter, were not observed for the sixth reduction. Importantly, TCF never issued a letter to Lincoln National and Sunset Village stating that the Letter had been reduced to an amount less than $3,189,693.69. TCF's argument is that because Lincoln National received a request for a reduction dated March 8, 2008, along with the required documentation, and that at the time Sunset Village was not in default of its obligations to Lincoln National, *ipso facto* the Letter was reduced by $937,333.09 by April 2010. This contention is not supported by the record, nor does TCF supply any law establishing that

33

such an automatic reduction in a letter of credit is even possible.

TCF further argues that equitable principles of waiver and estoppel require the Court to hold that the sixth reduction was completed and that Lincoln National waived its right to require strict compliance with Paragraph 10(e) of the First Amendment to Loan Agreement. As has been previously noted, these defenses are out of TCF's reach by virtue of the independence principle. *See Jupiter Orrington Corp.*, 469 N.E.2d at 591. Waiver, although not defined by the Uniform Commercial Code, is a well established principle of the common law. "Waiver in contract law is the intentional relinquishment of a known right." *Sethness-Greenleaf Inc., v. Green River Corp.*, 65 F.3d 64, 67 (7th Cir. 1995). Under Illinois law, an alleged waiver must either induce reliance or be clearly inferable from the circumstances. *See Cole v. Taylor Bank v. Truck Ins. Exch.*, 51 F.3d 736, 739 (7th Cir. 1995); *Lavelle v. Dominick's Finer Foods, Inc.*, 592 N.E.2d 287, 291-292 (Ill. App. Ct. 1992); *Tibbs v. Great Central Insurance Co.*, 373 N.E.2d 492, 493 (Ill. App. Ct. 1978).

In the present case, TCF argues that Lincoln National waived any right to require strict compliance with Paragraph 10(e) of the First Amendment to Loan Agreement by its custom of not complying with that provision and the reliance it induced in Sunset Village and TCF. Thus, the asserted waiver relates to Lincoln National's insistence in enforcing compliance with the six month limitation on reductions in the Letter of Credit. That limitation does not arise under the Letter of Credit agreement between Lincoln National

and TCF. Rather, the six month limitation arises under the contract between Sunset Village and Lincoln National. TCF is not a party to that contract. Thus, not only does the independence principle forbid the Court from looking to the agreement between the applicant (Sunset Village) and the beneficiary (Lincoln National), it is also untenable to argue that TCF had any right to rely on an alleged waiver of a provision to a contract to which it was not a party. Waiver of contractual rights cannot be asserted by one who is not a party to the relevant contract. *See Guice v. Sentinel Technologies, Inc.*, 689 N.E.2d 355, 361 (Ill. App. Ct. 1997) (citing *Western Waterproofing Company v. Springfield Housing Authority*, 669 F. Supp. 901 (C.D. Ill. 1987)). As the record establishes, there is no indication that Lincoln National knew that TCF was disbursing construction draws to Sunset Village. Under the Uniform Commercial Code, an attempted modification of a contract is effective as a waiver only if there is reliance. *See Wisconsin Knife Works v. Nat. Metal Crafters*, 781 F.2d 1280, 1287 (7th Cir. 1986). The record in this case is devoid of any reliance by TCF on any actions or statements by Lincoln National. Thus, there can be no grounds upon which to assert the equitable doctrine of waiver against Lincoln National by TCF. As there is no evidence upon which a finding of waiver can be made, TCF's argument that Lincoln National waived its right to enforce strict compliance with Paragraph 10(e) under the First Amendment to Loan Agreement must be rejected.

Equitable estoppel, like waiver, is also out of bounds by virtue of the independence

principle as an argument for TCF to use to support dishonoring the Letter of Credit or to argue that the Letter of Credit was reduced a sixth time. *See Jupiter Orrington Corp.*, 469 N.E.2d at 591. Equitable estoppel is the effect of conduct by one party such that it is absolutely forbidden from asserting rights, both at law and in equity, which it might otherwise have as against another party that has, on good faith, relied upon the other party's conduct and was therefore led to change its position for the worse. *See Geddes v. Mill Creek Country Club, Inc.*, 751 N.E.2d 1150, 1157 (Ill. 2001). "The test used to evaluate an estoppel claim is whether, considering all the circumstances of the specific case, conscience and honest dealing require that a party be estopped." *In re Krueger*, 192 F.3d 733, 740 (7th Cir. 1999). To state a valid estoppel claim under Illinois law, the party asserting estoppel is required to show:

> (1) voluntary words or conduct by the estopped party amounting to a misrepresentation or concealment of material facts; (2) actual or implied knowledge of the estopped party that the representations were not true; (3) lack of knowledge of the true facts by the innocent party both at time made or at time acted upon; (4) intent, or a reasonable expectation, on the part of the estopped party that the innocent party would act on the misrepresentations; (5) a reasonable, good-faith, detrimental change of position by the innocent party based on the misrepresentations; and (6) prejudice to the innocent party.

*Krueger*, 192 F.3d at 740-741 (quoting *Hubble v. O'Connor*, 684 N.E.2d 816, 823 (Ill. App. Ct. 1997)); *see also Geddes*, 751 N.E.2d at 1157. There is no evidence in the record to establish that Lincoln National made any misrepresentation of material facts to TCF. Likewise, there

is no evidence that Lincoln National had actual or implied knowledge of the falsity of any alleged representations. There is no showing of an intention or reasonable expectation on Lincoln National's part that TCF would act on any alleged misrepresentations. Furthermore, TCF cannot show that it incurred a reasonable good faith detrimental change of position based on Lincoln National's alleged misrepresentations. Thus, there was no misrepresentation of facts by Lincoln National to TCF, nor is there any evidence to suggest that Lincoln National intended TCF to act in any particular way, nor was there any detrimental reliance or change of position by TCF occasioned by any action taken by Lincoln National. Thus, TCF's claim for equitable estoppel is not only forbidden by the independence principle, it fails for a lack of proof.

In short, the independence principle requires that TCF look only to the Letter of Credit agreement between it and Lincoln National in honoring the Letter of Credit. The underlying contract between Lincoln National and Sunset Village cannot provide a basis for TCF to refuse to honor the Letter of Credit or to argue that a sixth reduction to the Letter of Credit occurred. The evidence in the record demonstrates that the Letter was not reduced after January 18, 2010 to an amount below $3,189,693.69. The procedures for reducing the Letter were not observed for the March 2010 reduction request. TCF attempts to argue that the Letter was amended by implication. As has been discussed, TCF is confused with respect to the method for amending a letter of credit (which must be

accomplished through a record) and the manner of consenting to an amendment to a letter of credit (which may be done by implication). Here, there is no evidence of a record amending the Letter below the amount of $3,189,693.69, and TCF did not issue a written amendment to which Lincoln National could have impliedly consented. Furthermore, TCF cannot prove the equitable doctrines of waiver and estoppel. TCF has no right to insist that Lincoln National waived a provision in a contract to which TCF was not itself a party, because third-parties to a contract cannot rely on alleged waivers of provisions of that contract. Furthermore, there is no evidence in the record to support the proposition that Lincoln National knew that TCF was disbursing construction draws to Sunset Village. Thus, Lincoln National cannot be said to have waived any rights which it possessed under the First Amendment to Loan Agreement between it and Sunset Village. There is likewise no evidence upon which to conclude that Lincoln National made any material misstatements of facts to TCF so as to support a claim of equitable estoppel. Nor is there any evidence that TCF detrimentally relied on any acts or statements by Lincoln National or that Lincoln National intended to induce TCF to act in any manner. For all of these reasons, the Court finds that TCF unlawfully dishonored the Letter of Credit by not paying Lincoln National the sum of $3,189,693.69 upon its presentation of a sight draft and the original Letter of Credit.

### IV. Conclusion

For the foregoing reasons, TCF's Motion for Summary Judgment is denied. Lincoln National's Motion for Summary Judgment is granted. TCF must pay to Lincoln National the outstanding sum on the Letter of Credit in the amount of $1,281,832.54, plus interest, attorneys' fees, costs, and expenses incurred in litigating this matter.


Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: June 20, 2012